IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAUN JAMES, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | No. _____ |
| -vs- ) | |
| ) | *(Jury Demand)* |
| CITY OF CHICAGO, Former ) | |
| CHICAGO POLICE SERGEANT ) | |
| RONALD WATTS, Former ) | |
| OFFICER KALLATT ) | |
| MOHAMMED, SERGEANT ) | |
| ALVIN JONES, OFFICER ) | |
| KENNETH YOUNG, OFFICER ) | |
| ROBERT GONZALEZ, OFFICER ) | |
| ELSWORTH J. SMITH, JR., ) | |
| OFFICER LAMONICA LEWIS, ) | |
| OFFICER RODERICK ) | |
| WATSON, PHILIP J. CLINE, ) | |
| KAREN ROWAN, DEBRA ) | |
| KIRBY, and other as-yet- ) | |
| unidentified officers of the ) | |
| Chicago Police Department, ) | |
| ) | |
| ) | |
| *Defendants.* ) | |

## COMPLAINT

Plaintiff, Shaun James, by his attorneys, Loevy & Loevy, hereby

complains against the Defendants, City of Chicago, former Chicago Police

Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed,

Sergeant Alvin Jones, Officer Kenneth Young, Officer Robert Gonzalez,

Officer Elsworth Smith, Officer Lamonica Lewis, Philip Cline, Karen Rowan,

Debra Kirby, and other as-yet-unidentified officers of the Chicago Police Department, and state as follows:

### Introduction

1.      Plaintiff Shaun James was sentenced to two years on probation for an alleged crime he did not commit.

2.      In fact, the crime never happened; it was completely fabricated by a group of corrupt Chicago police officers who framed Mr. James.

3.      This group of officers, a tactical team led by former Chicago Police Sergeant Ronald Watts, engaged in a pattern of robbery, extortion, excessive force, planting of evidence, and fabrication of false charges that spanned several years, and mirrored Mr. James's experience.

4.      Guilty of nothing other than being in the wrong place at the wrong time, Mr. James became a target of Defendant Watts when he could not identify individuals sought by Watts and, alternatively, would not pay for his freedom.

5.      In line with a proven pattern of retaliation and extortion, Watts and his fellow officers planted and brought drug charges against Mr. James. While in custody, the officers robbed Mr. James and threatened to bring similar charges against the mother of his child.

6.      Faced with staking his freedom on the credibility of his word against those of the officers ready to testify against him, Mr. James accepted a plea agreement.

7.     Through this lawsuit, Mr. James seeks accountability and compensation for being deprived of his liberty as a result of Defendants' misconduct.

## Jurisdiction and Venue

8.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

9.     This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331 and state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b). The Defendant City of Chicago is a municipal corporation located within the district, and events giving rise to the claims asserted herein occurred within this district.

## The Parties

11.     Shaun James is a 38-year-old man who currently lives in Chicago, Illinois.

12.     At all relevant times to this complaint, Defendants Ronald Watts, Kallatt Mohammed, Alvin Jones, Kenneth Young, Robert Gonzalez, Elsworth J. Smith, Jr., and Lamonica Lewis were Chicago police officers employed by the City of Chicago and acting within the scope of their employment and under the color of law. Collectively, these individual Defendants are referred to as the "Defendant Officers."

13. At all relevant times to this complaint, Defendant Watts was a leader of the Second District Tactical Team that worked at the Ida B. Wells housing complex. The Defendant Officers worked on Watts's tactical team.

14. At all relevant times, Defendant Philip J. Cline was the Superintendent of the Chicago Police Department.

15. At all relevant times, Defendants Karen Rowan and Debra Kirby were Assistant Deputy Superintendents of the Chicago Police Department, acting as the head of CPD's Internal Affairs Department. Collectively, these defendants and Defendant Cline, are referred to as "Defendant Supervisory Officers."

16. The Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD"). The City is responsible for the policies, practices, and customs of the City and the CPD.

### Factual Background

17. Prior to April of 2004, Shaun James, like many who frequented the Ida B. Wells housing complex, was well aware of Defendant Watts's penchant for corruption and abuse. In fact, Watts and his team had previously shaken down James personally.

18. At the time, Ida B. Wells was actively patrolled by Defendant Watts and the Watts Team.

19. Watts and his team members were well known to the residents of Ida B. Wells and those who frequented the complex. They maintained a visible presence and had a reputation for harassing residents of the Ida B. Wells housing complex.

### The Defendants Detain and Demand a Bribe from Mr. James

20. On April 3, 2004, Shaun James was spending time near Ida B. Wells.

21. While there, the Defendant Officers arrived in roughly seven police cars. Many people ran away.

22. Mr. James did not run. He had no reason to do so. He was doing nothing illegal and had no drugs or other contraband on him.

23. After chasing the men who ran, the Watts Team came back and detained Mr. James.

24. Members of the Watts Team demanded that Mr. James tell them who ran, and who in the building was selling drugs at that time. Mr. James repeatedly told them he did not know.

25. Unwilling to accept Mr. James's answer, Watts demanded that James pay him off to avoid arrest. James refused to do so, because he had done nothing wrong.

### The Defendants Fabricate a Drug Case

26. At the police station, Defendants Watts and Jones produced bags of drugs and showed them to Mr. James.

27.     Watts left Mr. James's presence and later reappeared with the mother of Mr. James's child, Crystal Looney. Watts threatened to frame and charge Looney.

28.     At that point, Mr. James gave Watts the money he had with him in an effort to make sure that Looney was not framed. That, however, was not enough for Watts.

29.     Following continued coercion and threats, Mr. James finally relented, telling Watts that he would take a case rather than allowing Watts to frame his girlfriend.

## Mr. James Pleads Guilty Facing Coordinated, Untruthful Accounts from the Defendants

30.     Following his arrest, Mr. James was unable to afford his bond. On April 29, 2004, Mr. James was officially charged.

31.     Facing the daunting proposition of wagering his freedom on the credibility of his word against that of the Defendant Officers, who were fully prepared to contradict Mr. James with their coordinated and untruthful accounts, Mr. James pled guilty to a Class 4 felony and received probation. Probation carried with it strict conditions that interfered with Mr. James's liberty, including curfew, frequent check-ins with a probation officer, drug tests, and searches of his residence.

## Defendant Watts and His Team Engaged in a Pattern of Misconduct for at Least a Decade, All Facilitated by the City's Code of Silence

32.     It was no secret within CPD that Watts and his team engaged in the type of misconduct that they directed at Mr. James.

33.     Government officials, including those with the City of Chicago, had knowledge of Watts's and his team's alleged misconduct as early as 1999.

34.     By 2004, top ranking CPD officials, including Defendants Cline and Kirby, were on notice of credible allegations of serious misconduct by the officers, coming from multiple sources.

35.     As years passed, high ranking CPD officials became aware of even more credible evidence of corruption and misconduct by Watts and his tactical team.

36.     In the months and years following Mr. James's arrest, the CPD continued to learn information demonstrating the officers' clear ongoing pattern of misconduct.

37.     Despite this growing mountain of evidence, CPD officials allowed the officers to continue to engage in their pattern of misconduct for years. CPD officials allowed the officers to remain on the street and never took any disciplinary action whatsoever.

**Watts and Mohammed Are Charged With Federal Crimes**

38.     Finally in 2012, after at least a decade of engaging in criminal misconduct, Defendants Watts and Mohammed were caught red-handed, shaking down a person they thought was a drug courier, but was actually an agent for the FBI.

39.     The United States government subsequently charged Watts and Mohammed with federal crimes.

40.    Watts and Mohammed each pled guilty to federal criminal charges and were sentenced to terms of imprisonment. *See United States v. Watts*, No. 12-CR-87-1 (N.D. Ill.); *United States v. Mohammed*, No. 12-CR-87-2 (N.D. Ill.).

41.    In its sentencing memorandum in the Watts case, the Government explained that "[f]or years," "the defendant [Watts] used his badge and his position as a sergeant with the Chicago Police Department to shield his own criminal activity from law enforcement scrutiny." His crimes included "stealing drug money and extorting protection payments" from the individuals he was sworn to protect and serve.

42.    The government revealed that, for years, Defendants Watts and Mohammed extorted tens of thousands of dollars in bribes from individuals at the Wells public housing complex on numerous occasions as part of their duties with the Chicago Police Department.

43.    During the sentencing hearing, the government urged Judge Sharon Johnson Coleman to "consider the other criminal conduct that the defendant [Watts] engaged in in the course of his career as a police officer," specifically noting that during the federal investigation Watts "did other things such as putting a false case on the confidential source that was involved in our investigation. Had him arrested on drug charges. And the source … felt he had no chance of successfully fighting that case so he pled guilty to a crime he didn't commit." The federal prosecutor wondered aloud

"how many times [Watts] might have done something similar when the government was not involved."

44. Following the federal indictments of Watts and Mohammed, City officials made efforts to downplay the magnitude of Watts's criminal enterprise.

45. Notwithstanding the evidence that investigators had amassed over the years pointing to a wide, decade-long criminal enterprise, CPD Superintendent Garry McCarthy publicly stated, "There is nobody involved other than the two officers who were arrested."

### The City's "Code of Silence"

46. Mr. James's unjust arrest was made possible by a "code of silence" that has existed for years within the Chicago Police Department.

47. Under this code, police officers are expected to conceal each other's misconduct, in contravention of their sworn duties, and penalties for breaking the code of silence within the CPD are severe.

48. As one CPD officer has explained, "[The Chicago Police Academy told officers] over and over again we do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch

commander and request a new partner. But you never break the code of silence."

49.    Pursuant to this "code of silence," each of the Defendant Officers concealed from Mr. James information that Watts and his teammates were in fact engaged in a wide-ranging pattern of misconduct. Had this information been disclosed to Mr. James, he would have been able to use it to impeach the officers' accounts, which would have changed the outcome of the criminal proceedings instituted against him.

50.    Also, consistent with this "code of silence," the few people who stood up to Watts and his crew and/or attempted to report his misconduct were either ignored or punished, and Watts and his crew continued to engage in misconduct with impunity.

### Careers of CPD Officers Daniel Echeverria and Shannon Spaulding Are Nearly Ruined

51.    For example, in 2006, two Chicago police officers, Daniel Echeverria and Shannon Spaulding learned credible information from arrestees that Watts and his crew were engaged in illegal drug activity.

52.    Officer Echeverria took the allegation seriously and he reported it to a CPD supervisor. The supervisor made clear that he was not interested in learning about the allegation, and he directed Echeverria not to document the allegations.

53.    Echeverria and Spaulding subsequently reported the allegations about Watts and his crew to the FBI. Soon thereafter, Echeverria and

Spaulding began cooperating with the FBI, actively assisting the FBI's investigation of Watts and his crew.

54.     When their cooperation became known to officers within their CPD chain of command, Spaulding and Echeverria were labeled "rats" within the Department, their lives were threatened, and they endured all manner of professional retaliation by members of the CPD.

55.     Spaulding and Echeverria subsequently sued the City for the retaliation they suffered for blowing the whistle on Watts and his crew. On the eve of trial in that case, the City settled for $2 million.

### CPD Officer Michael Spaargaren's Life Is Threatened

56.     Sometime in the mid-2000s, a CPD officer named Michael Spaargaren was assigned to work with Watts in public housing.

57.     Spaargaren observed that Watts did not inventory drugs and money that the officers seized during arrests, and Spaargaren confronted Watts about the misconduct.

58.     In response, Watts threatened to put a false case against Spaargaren and made veiled threats to kill him.

59.     A CPD Lieutenant in the chain of command subsequently warned Spaargaren to keep his mouth shut, or his life would be in danger.

60.     Fearful for his life, Spaargaren opted to take a one-and-a-half-year leave of absence from CPD rather than to continue to work under Watts.

## Citizen Complaints Go Nowhere

Defendants Watts, Mohammed, and other members of Watts's tactical team had accumulated numerous citizen complaints concerning violations of their civil rights over the years, beginning well before the misconduct Defendants committed against Mr. James.

61.     On information and belief, complaints that the City bothered to investigate largely boiled down a he-said-she-said between the officer and the citizen, and the City's policy to resolve those disputes in the officers' favor, no matter how many citizens come forward with the same type of complaint.

## The City Turns a Blind Eye to the Clear Pattern of Alleged Misconduct that Emerged from Watts and His Team

62.     Despite all of the evidence that was amassed over the years of a pattern and practice of criminal misconduct by Defendant Officers, on information and belief, the City never undertook its own investigation of the clear pattern that emerged.

63.     As City officials were aware, the purpose of the FBI investigation was to investigate and prosecute criminal activity, not to impose discipline and control of the City's Police Department.

64.     Nothing about the FBI investigation relieved the City of its fundamental responsibility to supervise, discipline, and control its officers. Nevertheless, the City completely abdicated this responsibility, allowing the widespread misconduct to continue undeterred throughout the FBI's criminal investigation of Watts and his crew.

65. During the FBI investigation, which spanned at least eight years, City officials had reason to believe that Watts and his crew were committing ongoing criminal activity on the streets—extorting drug dealers and framing citizens of crimes they did not commit—yet City officials took no steps to prevent these abuses from occurring.

66. Instead, City officials let officers on Watts's crew continue to pursue criminal charges against citizens like Mr. James, and to testify falsely against citizens like Mr. James.

67. Even worse, City officials withheld information they had about the officers' pattern of transgressions, information that citizens like Mr. James could have used to impeach the corrupt officers and defend against the bogus criminal charges placed upon them.

**Mr. James's Exoneration**

68. When Watts and Mohammed were finally publicly exposed as criminals, Mr. James finally had an opportunity to vindicate himself in court.

69. After retaining counsel and obtaining documents through the Freedom of Information Act, Mr. James filed a post-conviction petition with the evidence to finally convince the court and prosecutors to believe what he had been saying all along: that Watts and his team were crooked cops who framed him.

70. On November 16, 2017, the Cook County State's Attorney dismissed all charges stemming from Mr. James's conviction.

71.     In commenting on the November 16, 2017 decision to agree to vacate Mr. James's, along with the 16 other convictions, and *nolle pros* all cases, Mark Rotert, the head of the Cook County State's Attorney's Office's Conviction Integrity Unit, stated that "In these cases, we concluded, unfortunately, that police were not being truthful and we couldn't have confidence in the integrity of their reports and their testimony."

72.     As a result, the CCSAO will no longer call certain member of Watts's crew, including Defendants Jones, as witnesses in any pending or future matters because of their credibility concerns and alleged involvement in misconduct.

73.     In addition, shortly after the 18 convictions were vacated, Superintendent Johnson placed Defendants Jones and Smith, along with other members of Watts's crew, on desk duty.

74.     On January 9, 2018, Mr. James received a certificate of innocence for his conviction.

## Mr. James' Damages

75.     As a result of Defendants' egregious misconduct, Mr. James was unlawfully detained, temporarily losing his freedom and suffering intense mental anguish in the process. Moreover, after his unjust conviction, Mr. James was forced to spend thirteen years fighting to overturn his conviction and clear his name.

76. As a result of the foregoing, Mr. James has suffered tremendous damage, including emotional damage, all proximately caused by Defendants' misconduct.

### Count I: 42 U.S.C. § 1983 – Due Process

77. Each paragraph of this Complaint is incorporated as if restated fully herein.

78. In the manner described more fully above, the Defendant Officers, while acting as investigators, individually, jointly, and in conspiracy with each other, deprived Plaintiff of his constitutional right to due process and a fair trial.

79. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

80. Likewise, in the manner described more fully above, Defendants Philip J. Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified CPD supervisors, had knowledge of a pattern of misconduct by Watts and his team. These Defendant Supervisory Officers knew of a substantial risk that Watts and his team would violate the rights of Mr. James and other residents of the Ida B. Wells complex, and they deliberately chose a course of action that allowed those abuses to continue, thereby condoning those abuses.

81. The constitutional injuries complained of herein were proximately caused by the intentional misconduct of the Defendant Supervisory Officers, or were proximately caused when the Defendant Supervisory Officers were deliberately, recklessly indifferent to their subordinates' misconduct, knowing that turning a blind eye to that misconduct would necessarily violate Plaintiff's constitutional rights.

82. In addition, the Defendant Supervisory Officers themselves concealed exculpatory evidence from Mr. James, specifically information about Watts's and his team's pattern of misconduct. In this way, the Defendant Supervisory Officers violated Mr. James's due process right to a fair trial deliberately and with reckless disregard for Mr. James's rights.

83. The Defendants' misconduct directly resulted in the unjust criminal convictions of Plaintiff, thereby denying his constitutional right to due process and a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

84. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence.

85. The Defendants' actions were taken under color of law and within the scope of their employment.

86.     The City of Chicago is also directly liable for the injuries described in this Count because the City and CPD maintained official policies and customs that were the moving force behind the violation of Plaintiff's rights and also because the actions of the final policymaking officials for Defendant City of Chicago and the CPD were the moving force behind the violation of Plaintiff's rights.

87.     At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago maintained a system that violated the due process rights of criminal defendants like Mr. James by concealing exculpatory evidence of officers' patterns of misconduct.

88.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Chicago had notice of a widespread practice by its officers and agents under which criminal suspects, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

89.     As a matter of both policy and practice, the Defendant City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, control, and discipline its police officers, such that its failure to do so manifests

deliberate indifference. The Defendant City's actions leads police officers in the City of Chicago to believe that their actions will never be scrutinized and, in that way, directly encourages further abuses such as those that affected Plaintiff.

90. The above-described widespread practices, which were so well-settled as to constitute the *de facto* policy of the City of Chicago, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. These widespread practices were allowed to flourish because the Defendant City and the CPD declined to implement sufficient policies or training, even though the need for such policies and training was obvious. The Defendant City and the Department also declined to implement any legitimate mechanism for oversight or punishment of officers, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

91. Furthermore, the misconduct described in this Complaint was undertaken pursuant to the policy and practices of the Defendant City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago and the CPD, or were actually committed by persons with such final policymaking authority.

92. Indeed, municipal policymakers have long been aware of the Defendant City's policy and practice of failing to properly train, monitor, investigate, and discipline misconduct by its police officers, but have failed to take action to remedy the problem.

93. For example, at a City Council hearing on September 28, 1999, in response to two high-profile unjustified police shootings, Superintendent Terry Hillard noted the need for better in-service training on the use of force, early detection of potential problem officers, and officer accountability for the use of force.

94. Likewise, in June 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

95. In 2001, the Justice Coalition of Greater Chicago ("JCGC"), a coalition of more than a hundred community groups, confirmed the findings of that resolution, concluding that the Chicago Police Department lacked many of the basic tools necessary to identify, monitor, punish and prevent police misconduct. The JCGC findings were presented to Mayor Daley, Superintendent Hillard, and the Chicago Police Board.

96. Despite the municipal policymakers' knowledge of the City's failed policies and practices to adequately train, supervise, investigate,

discipline, and control its police officers, nothing was done to remedy these problems.

97. As a result, the CPD has continued to respond to complaints of police misconduct inadequately and with undue delay, and to recommend discipline in a disproportionately small number of cases.

98. Indeed, by its own admissions, over 99% of the time when a citizen complains that his or her civil rights were violated by police officers, the City sides with the police officer and concludes that no violation occurred.

99. Notably, Defendants Watts and Mohammed are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

100. In 2001, Chicago police officer Joseph Miedzianowski was convicted on federal criminal charges, including racketeering and drug conspiracy. The jury found that Miedzianowski engaged in corruption for much of his 22-year police career, using his street informants to shake down drug dealers and sell drugs.

101. Miedzianowski, like the Defendant Officers in this case, had accumulated dozens of complaints over the years, which the Defendant City routinely deemed unfounded or not sustained.

102. In 2011, Chicago police officer Jerome Finnigan was convicted and sentenced on federal criminal charges, including a charge of attempting

to hire someone to kill a police officer who Finnigan believed would be a witness against him on his own corruption charges in state court.

103. Finnigan was part of a group of officers in the Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

104. Finnigan, like the Defendant Officers in this case, had accumulated dozens of citizen complaints over the years, which the Defendant City routinely deemed unfounded or not sustained.

105. At his sentencing hearing in 2011, Finnigan stated, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

106. In the case of *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill.), a federal jury found that as of 1994, the CPD maintained a code of silence that facilitated misconduct committed by Miedzianowski.

107. Likewise, in the case of *Obrycka v. City of Chicago et al.*, No. 07 CV 2372 (N.D. Ill.), a federal jury found that as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

108. The same constitutionally-defective oversight system in place in during the time periods at issue in the *Klipfel* and *Obrycka* cases was also in place in 2004, when Mr. James suffered the abuse described above.

109. Indeed, the problem found to exist by the juries in *Klipfel* and *Obrycka* continues to this day. In December 2015, Mayor Rahm Emanuel acknowledged that a "code of silence" exists within the Chicago Police Department that encourages cover-ups of police misconduct, and that the City's attempts to deal with police abuse and corruption have never been adequate.

110. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

111. The Defendant City's investigation of complaints is characterized by unreasonably long delays, despite the relatively straightforward nature of many misconduct claims.

112. Although the Defendant City has long been aware that its supervision, training, and discipline of police officers is entirely inadequate, it has not enacted any substantive measures to address that deficiency.

113. Instead, the Defendant City continues to inadequately investigate citizen complaints. It has also failed to modify its officer training programs to reduce misconduct against Chicago residents or to implement a system to identify and track repeat offenders, districts, or units.

114. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

115.    Plaintiff's injuries were caused by officers, agents, and employees of the Defendant City of Chicago and the Chicago Police Department, including but not limited to the individually named Defendants, who acted pursuant to the policies, practices, and customs set forth in engaging in the misconduct described in this Count.

### Count II: 42 U.S.C. § 1983 – Fourth Amendment – Malicious Prosecution and Unlawful Detention

116.    Each paragraph of this Complaint is incorporated as if restated fully herein.

117.    In the manner described more fully above, Defendants, while acting as investigators, individually, jointly, and in conspiracy with each other, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

118.    In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

119.    The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

120. Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of liberty.

121. In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence.

122. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's clear innocence.

123. The Defendants' actions were taken under color of law and within the scope of their employment.

124. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

125. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for Defendant City of Chicago, in the manner described more fully above.

### Count III: 42 U.S.C. § 1983 – Failure to Intervene

126.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

127.    In the manner described more fully above, during the constitutional violations described herein, the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

128.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

129.    The Defendants' actions were taken under color of law and within the scope of their employment.

130.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

131.    Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count IV: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

132.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

133.    Prior to Plaintiff's convictions, all of the Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. James for crimes he did not commit and thereby to deprive him of his constitutional rights, all as described above.

134.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability by depriving Plaintiff of his rights.

135.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

136.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

137.    The Defendants' actions were taken under color of law and within the scope of their employment.

138.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation,

degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

139. Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago, and by Defendants who were final policymakers for the Defendant City of Chicago, in the manner described more fully above.

### Count V: Illinois Law – Malicious Prosecution

140. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

141. In the manner described more fully above, Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

142. In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

143. Plaintiff's criminal prosecutions were terminated in his favor, in a manner indicative of innocence.

144. The Defendants' actions were taken under color of law and within the scope of their employment.

145.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VI: Illinois Law – Intentional Infliction of Emotional Distress

146.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

147.   The actions, omissions, and conduct of the Defendant Officers, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

148.   The Defendants' actions were taken under color of law and within the scope of their employment.

149.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VII: Illinois Law – Civil Conspiracy

150.   Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

151. As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for crimes he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

152. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

153. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless and deliberate indifference to the rights of others, and in total disregard of the truth and of Plaintiff's innocence.

154. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### Count VIII: Illinois Law – *Respondeat Superior*

155. Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

156. While committing the misconduct alleged in the preceding paragraphs, Defendant Officers were employees, members, and agents of the

City of Chicago, acting at all relevant times within the scope of their employment.

157.    Defendant City of Chicago is liable as principal for all torts committed by their agents.

## Count IX: Illinois Law – Indemnification

158.    Each preceding paragraph of this Complaint is incorporated as if restated fully herein.

159.    Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

160.    Defendant Officers were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff Shaun James, respectfully requests that this Court enter a judgment in his favor and against the City of Chicago, former Chicago Police Sergeant Ronald Watts, former Chicago Police Officer Kallatt Mohammed, Sergeant Alvin Jones, Officer Kenneth Young, Officer Robert Gonzalez, Officer Elsworth J. Smith, Jr., Officer Lamonica Lewis Officer, Officer Roderick Watson, Philip Cline, Karen Rowan, Debra Kirby, and other as-yet-unidentified officers of the Chicago Police Department, awarding compensatory damages, attorneys' fees and costs against each Defendant,

punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

Respectfully submitted,

/s/Scott Rauscher
One of Plaintiff's Attorneys

Jon Loevy
Arthur Loevy
Scott Rauscher
Theresa Kleinhaus
Joshua Tepfer
Sean Starr
Loevy & Loevy
311 North Aberdeen Street
Third Floor
Chicago, Illinois 60607
Phone: (312) 243-5900